# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 24-cv-02915

UNITED STATES OF AMERICA,

      Plaintiff,

v.

ROCKET MORTGAGE, LLC;
SOLIDIFI U.S. INC.;
MAKSYM MYKHAILYNA; and
MAVERICK APPRAISAL GROUP INC.,

      Defendants.

---

## COMPLAINT

---

## INTRODUCTION

1.    The United States of America brings this action to enforce Title VIII of the Civil Rights Act of 1968, as amended ("the Fair Housing Act"), 42 U.S.C. §§ 3601–3619, on behalf of Francesca Cheroutes, a Black woman, pursuant to 42 U.S.C. § 3612(o).

2.    In January 2021, during a time of falling interest rates and rising home values in the Denver area, Ms. Cheroutes sought to refinance the property she owns at 749-751 Ash Street, Denver, Colorado ("Subject Property"), with Defendant Rocket Mortgage, LLC ("Rocket"). This required an appraisal. A previous appraisal of the

Subject Property, which had been completed less than a year before, and also in connection with a mortgage from Rocket, valued Ms. Cheroutes's home at $860,000.

3.      Rocket contracted with Solidifi U.S. Inc. ("Solidifi"), an appraisal management company ("AMC"), to conduct an appraisal of the Subject Property (the "Subject Appraisal"). Solidifi, which maintains a "panel" of appraisers that it trains and approves to carry out appraisals in accordance with Solidifi's standards, arranged for one of those appraisers, Defendant Maksym Mykhailyna, the Chief Executive Officer of Defendant Maverick Appraisal Group Inc. ("Maverick"), to perform the appraisal for Rocket. Mr. Mykhailyna and Maverick agreed to conduct the appraisal for Solidifi and then completed the appraisal and submitted it to Solidifi, which submitted it to Rocket pursuant to its contract.

4.      In performing the appraisal, Mr. Mykhailyna and Maverick significantly undervalued Ms. Cheroutes's home because of her race and color. Mr. Mykhailyna met Ms. Cheroutes during the appraisal and knew that the Subject Property was occupied by a Black family when he performed the appraisal. Ms. Cheroutes told Mr. Mykhailyna about recent improvements to the property, including new gutters, new doors, and updates to the kitchen and bathroom. He did not respond and did not include this information in his report.

5.      Mr. Mykhailyna appraised the property at $640,000, which was $220,000 lower than the earlier appraisal. Mr. Mykhailyna's appraisal was also lower than the sales prices of all six comparable duplexes within a mile of the property, which Mr.

Mykhailyna's agreement with Solidifi directed him to consider in the appraisal. Mr. Mykhailyna disregarded all but one of these comparables and instead relied on sales of properties that were farther away and in neighborhoods with greater concentrations of Black persons than the predominantly White neighborhood where Ms. Cheroutes lived. Mr. Mykhailyna's approach differed markedly from how he appraised a property of a White owner in Ms. Cheroutes's neighborhood one month before the Subject Appraisal. The relevant facts and circumstances, as explained in more detail below, demonstrate that Mr. Mykhailyna used faulty comparables and made other inaccurate assumptions because Ms. Cheroutes was Black.

6.      After Ms. Cheroutes received the Subject Appraisal, she contacted Rocket, informed the company that the appraisal was significantly lower than the prior appraisal, and explained why she believed the appraisal was motivated by racial discrimination.

7.      Despite being given this information, Rocket insisted on using the appraisal in the mortgage loan refinancing. Rocket told Ms. Cheroutes that she could either proceed with the refinancing using the discriminatory appraisal, or her refinancing application would be canceled. When Ms. Cheroutes continued to request that the appraisal be changed or redone because it was discriminatory, Rocket canceled her application.

8.      Ms. Cheroutes filed a complaint with the U.S. Department of Housing and Urban Development ("HUD"). HUD investigated the complaint and determined that

Defendants had engaged in one or more discriminatory housing practices against Ms. Cheroutes in violation of the Fair Housing Act.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1345 and 42 U.S.C. § 3612(o).

10.     Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to these claims occurred in the District of Colorado.

## PARTIES AND SUBJECT PROPERTY

11.     Plaintiff is the United States of America.

12.     Defendant Maverick is an appraisal company incorporated in Colorado, with its principal place of business in Denver, Colorado. All actions taken by Defendant Maverick relevant to this Complaint, including through the actions of its agent Maksym Mykhailyna, were taken pursuant to its agreement with, and as an agent of, Defendant Solidifi.

13.     Defendant Maksym Mykhailyna is a licensed appraiser and the owner and Chief Executive Officer of Maverick. All actions taken by Mr. Mykhailyna relevant to this Complaint were taken in his capacity as the owner of, and as an agent of, Defendant Maverick, and also as an agent of Solidifi.

14.    Defendant Solidifi is an AMC incorporated in Delaware, with its principal place of business in Buffalo, New York. Defendant Solidifi does business in the District of Colorado.

15.    Defendant Rocket is a mortgage lender incorporated in Michigan, with its principal place of business in Detroit, Michigan. Defendant Rocket does business in the District of Colorado.

16.    The Subject Property is a duplex located at 749-751 Ash Street, Denver, Colorado. It consists of two units. Each unit has two levels, three bedrooms, and two bathrooms. The Subject Property is a "[d]welling" within the meaning of the Fair Housing Act, 42 U.S.C. § 3602(b).

17.    At all relevant times, Ms. Cheroutes owned the Subject Property and resided in one of the two units of the Subject Property. She is an "[a]ggrieved person" within the meaning of the Fair Housing Act, 42 U.S.C. § 3602(i).

## ALLEGATIONS REGARDING DEFENDANTS' DISCRIMINATION AGAINST MS. CHEROUTES

**A.    Home ownership, residential segregation, and property valuation are historically intertwined.**

18.    Equity in residential real estate is the primary source of wealth for many American families. According to the Pew Research Center, "[h]ome equity looms large in household wealth. In 2021, the median net worth of U.S. households overall stood at $166,900, counting all assets. But their median net worth *without* home equity included

was only $57,900" (emphasis in original).[1] Thus, the stakes involved in home ownership and the value of one's home are high. These stakes are often particularly important for Black households, for which the value of a home comprises on average 63% of total wealth, as compared to only 41% for White homeowners.[2]

19.     Denver, like most American cities, has a history of residential segregation by race. This fact was illustrated in a school desegregation lawsuit where the Denver School Board argued that its racially segregated schools were "the result of residential patterns" rather than deliberate segregation on the part of the School Board. *See Keyes v. Sch. Dist. No. 1, Denver, Colo.*, 413 U.S. 189, 212 (1973).

20.     Property values have historically been influenced by race. In the first two-thirds of the 20th century, properties in neighborhoods with greater concentrations of Black residents were systematically valued lower than properties in neighborhoods predominantly comprised of White residents. The federal government played a role in this process by discouraging banks from offering home loans in areas where larger concentrations of Black residents lived, a process commonly known as "redlining."[3] As a consequence, homes owned by Black residents were, on average, valued lower than

---

[1] Rakesh Kochhar and Mohamad Moslimani, *Wealth Surged in the Pandemic, but Debt Endures for Poorer Black and Hispanic Families*, ch. 4, Pew Research Center (2023), available at https://perma.cc/SMV3-5KPF.

[2] *Id.*

[3] Federal Reserve History, *Redlining* (June 2, 2023), available at https://perma.cc/EF97-JPCA.

homes owned by White residents, and when Black residents moved into predominantly White neighborhoods, property values would often decrease.[4]

21.     To obtain a loan to purchase a property or refinance a mortgage, a real-estate appraisal is usually required. In the past, appraisal standards and criteria contained explicit racial factors, which instructed appraisers to consider the racial makeup of the surrounding neighborhood as part of assigning a value to a home.[5] In the 1970s, the U.S. Department of Justice sued to end the practice of using race in real-estate appraisals. *See United States v. Am. Inst. of Real Est. Appraisers*, 442 F. Supp. 1072, 1076 (N.D. Ill. 1977).

22.     Recent studies indicate that race continues to play a role in some appraisals. Appraisals for home purchases are more likely to fall below the contract price when the borrower is Black than when the borrower is White.[6] Similarly, a higher percentage of White residents correlates with higher appraised values in a

---

[4] Daniel Aaronson, Daniel Hartley, and Bhashkar Mazumder, *The Effects of the 1930s HOLC "Redlining" Maps*, Working Paper 2017-12, Federal Reserve Bank of Chicago (2020), available at https://perma.cc/ZS8E-H98N; Prottoy A. Akbar, Sijie Li Hickly, Allison Shertzer, and Randall P. Walsh, *Racial Segregation in Housing Markets and the Erosion of Black Wealth*, The Review of Economics and Statistics (2022), available at https://doi.org/10.1162/rest_a_01276.

[5] *See* Frederick Babcock, Appraisal of Real Estate 71 (1924); George L. Schmutz, The Appraisal Process 168 (1951).

[6] Freddie Mac, *Racial and Ethnic Valuation Gaps In Home Purchase Appraisals* (2021), available at https://perma.cc/TK9F-PT2D.

neighborhood, even when controlling for house quality, neighborhood socioeconomic status, and area amenities.[7]

**B.    Ms. Cheroutes's purchase of the Subject Property.**

23.    Ms. Cheroutes is Black and has two adult children.

24.    Ms. Cheroutes purchased the Subject Property in 2011 for $270,000, and she still owns the Subject Property today.

25.    At the time of purchase, Ms. Cheroutes took out a loan to cover both the purchase price and the cost of major renovations that she subsequently completed.

26.    At all times relevant to the Subject Appraisal, Ms. Cheroutes has lived in the unit at 751 Ash Street and has rented out the unit at 749 Ash Street.

27.    Ms. Cheroutes purchased the Subject Property at a favorable time. Between 2011 and 2021, the average home sale price in the Denver metro area[8] increased from about $256,000 to about $612,000.[9]

---

[7] Junia Howell and Elizabeth Korver-Glenn, *Appraised: The Persistent Evaluation of White Neighborhoods as More Valuable Than Communities of Color*, at 10–12 (2022), available at https://perma.cc/C6MK-A77M.

[8] The real estate industry defines "Denver metro area" as including the City and County of Denver and ten other nearby counties. *See* REcolorado, *Market Trends*, available at https://perma.cc/XF4L-QQMN.

[9] Katie Eastman, *Priced Out: How the Denver Metro housing market got to where it is today*, 9News (May 15, 2022), available at https://perma.cc/6KW7-JYT3.

28.     Ms. Cheroutes's home is located in the Hale neighborhood of Denver,

three miles from downtown Denver, one mile from Congress Park, and just a few blocks

from popular restaurants and Rose Medical Center.

29.     The Subject Property, shown below in a recent photograph, is located

mid-block on a shady, tree-lined residential street. Within two blocks of the Subject

Property is the second location of Snooze A.M. Eatery, a breakfast/brunch restaurant

that now has over 70 locations in ten states. The Subject Property is also located a

short two-block walk from the first Trader Joe's grocery store to open in Denver.



30.     As shown in the map below, the Subject Property is located a few blocks

east of Colorado Boulevard, on the edge of the Hale neighborhood. On the other side of

Colorado Boulevard lies the neighborhood of Congress Park. And just south of the Subject Property is the neighborhood of Hilltop, which is one of the wealthiest neighborhoods in Denver, with some of the highest property values in the city. The population of Hale is predominantly White: its resident population is approximately 77 percent White and 5 percent Black. The Subject Property's census block group is approximately 78 percent White and 4 percent Black. Congress Park is approximately 81 percent White and 3 percent Black.



**Location of Subject Property**

- ■ Subject Property
- Colorado Boulevard
- ☐ Neighborhood Boundaries

**C.    Ms. Cheroutes sought to refinance the Subject Property to take advantage of historically low interest rates.**

31.    In late 2020, Ms. Cheroutes learned that interest rates for residential mortgage loans were at historic lows and had dropped significantly even in the prior year. Seeking to save money by refinancing with those low rates, Ms. Cheroutes contacted Rocket, a company she had used previously for her home mortgage, about refinancing her mortgage loan on the Subject Property.

32.    When Ms. Cheroutes initially contacted Rocket, a representative told her that an application for a new mortgage loan would be worthwhile because the rates were so low and that it was not an issue that she had already refinanced—through Rocket—a year earlier.

33.    The Rocket representative provided a written loan estimate to Ms. Cheroutes. The loan estimate stated that the loan amount was $563,000, the interest rate was fixed at 2.75%, and mortgage insurance was not required. The loan estimate indicated that these terms were based in part on an estimated property value of $860,000, which was the appraised value of the property for Rocket's refinancing the previous year. Compared with her existing mortgage loan, the loan estimate provided a lower interest rate, lower monthly payment amount, shorter loan term, and lower total repayment amount over the lifetime of the loan.

34.    The Rocket representative informed Ms. Cheroutes that an appraisal of the property would be required, as the refinancing estimate was dependent on the value of the property.

**D.    Background on residential appraisals.**

35.    Appraisals must comply with the Uniform Standards of Professional Appraisal Practice ("USPAP"). *See* 12 U.S.C. § 3339. An appraisal, according to the USPAP, is "the act or process of developing an opinion of value," and it is also the name of an opinion of value.

36.    Once a mortgage loan applicant provides certain basic pieces of information to a lender, the lender is required to provide a written loan estimate. Next, the lender will generally obtain a residential appraisal and rely on that appraisal in its decision regarding the loan application. If the appraised value is less than the estimated value in the loan estimate, it is more likely that the lender will not offer a loan or will offer terms that are less favorable to the applicant.

37.    The process for preparing residential appraisals for what are known as "conventional" mortgage loans in the United States has been standardized by the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac"). Appraisers evaluating residential properties for conventional loans generally use the forms promulgated by Fannie Mae and Freddie Mac to appraise property.

38.    A residential appraisal involves conducting an in-person home inspection of the property at issue and gathering many details about the property and its characteristics by consulting documentary materials such as tax records and property databases.

39.    Once the appraiser has collected details about the property, the appraiser searches for sales comparables ("comps") to derive an estimated value for the property.[10] Sales comps should have similar characteristics to the property, and their sale dates should also be relatively close in time to the appraisal date. Appraisers will sometimes choose two or more properties to serve as sales comps, one with certain characteristics that are greater and/or better than the property and the other with characteristics that are lesser and/or worse. This technique is called "bracketing," and it allows the appraiser to arrive at a middle-ground value for the property being appraised.

40.    Once sales comps are chosen, the appraiser then makes monetary adjustments to each comp to account for differences between the comp and the subject property. The Fannie Mae/Freddie Mac uniform appraisal forms list categories where adjustments may be made.[11] The appraiser then chooses an appraised value based on the adjusted values of the sales comps.

---

[10] This section describes the "sales-comparison approach" to property valuation. Other methods include the cost-comparison approach and the income approach. All appraisals discussed in this Complaint used the sales-comparison approach.

[11] These categories include: whether there were sale or financing concessions; the date of the sale; the location of the property; whether the property is a leasehold or fee simple; the site size; whether the property has a view; the design/style of the property; the quality of the property's construction; the age of the property; the condition of the property; the property's gross building area; the number of rooms, bedrooms, and bathrooms in the property; the property's basement features; and a number of other amenities or physical characteristics such as the type of utilities, whether the property has a patio or porch, etc.

41.     Mortgage lenders and AMCs often have guidelines or criteria regarding the choice of sales comps and default adjustment amounts. Within these general guidelines, the appraiser still must make choices when selecting appropriate sales comps and making appropriate adjustments. Those choices by appraisers can significantly affect their ultimate opinion of a property's value.

**E.      Solidifi's role in the appraisal process.**

42.     As an AMC, Solidifi contracts with lenders to conduct appraisals, which must be completed as part of financing a home loan.

43.     To complete the required appraisal as part of Ms. Cheroutes's refinancing application, Rocket contracted with Solidifi to conduct an appraisal of the Subject Property.

44.     On or about January 14, 2021, Solidifi entered into an agreement with Maverick to carry out the appraisal. The agreement between Solidifi and Maverick specified certain standards Maverick would follow in carrying out the appraisal, gave Solidifi authority to require changes to the appraisal under certain circumstances, required Maverick to notify Solidifi of any complaints it received about its work from the homeowner or borrower, and stated that the appraisal was a "work[] made for hire" that would constitute the property of Solidifi.

45.     Before this appraisal, Solidifi had an ongoing working relationship with Mr. Mykhailyna and Maverick. Solidifi maintains a panel of appraisers it uses to enable Solidifi to carry out appraisals with lenders. Without a panel of appraisers, AMCs like

Solidifi would not exist because they would have no one to complete the appraisals being requested by lenders. Thus, the appraiser panel is the core of how Solidifi performs contracts for lenders.

46.     Solidifi takes several steps to control the appraisers who serve on its panel. To determine who is eligible to join its panel of appraisers, Solidifi's Credentials Management Team reviews documents and information, including licensing and insurance, and conducts a background check.

47.     After initial acceptance, Solidifi puts an appraiser in "New Recruit" status until the appraiser successfully completes a series of steps. These steps include completing three appraisals that include multiple levels of monitoring by Solidifi, including feedback and coaching from Solidifi's Regional Manager. The appraiser must have an interview with the Regional Manager, and it must receive approval that it has met Solidifi's standards for the types of appraisals it is seeking to be assigned. Only then will Solidifi promote an appraiser from "New Recruit" to "Active Status," which allows the appraiser to be assigned general appraisal orders.

48.     When Solidifi assigns an appraiser to a project, Solidifi provides the appraiser with a letter of engagement informing the appraiser of the assignment type and the criteria.

49.     Even once an appraiser is in "Active Status," Solidifi exercises a significant amount of control over how the appraiser completes an appraisal. As described in further detail below, Solidifi provided extensive guidance and guidelines to Mr.

16

Mykhailyna in how to conduct the Subject Appraisal. In addition, in order to accept an appraisal assignment, Mr. Mykhailyna was required to, and did, agree that Solidifi had the right to review and require changes to any appraisal in order to ensure that the appraisal met applicable professional and industry standards and any applicable governmental requirements.

50.     Solidifi's contracts with appraisers also make clear that Solidifi owns the appraisals that are produced by its appraisers.

51.     Solidifi requires its appraisers to follow a code of conduct, which requires them to help create a positive work environment, avoid conflicts of interest, and preserve confidentiality.

52.     Appraisers on Solidifi's panel of appraisers use Solidifi's computer systems for various tasks, including communicating with Solidifi and submitting the appraisal reports to Solidifi.

53.     AMCs also control their appraisers through quality control and rating systems. Solidifi rates its appraisers and tracks its appraisers' work history.

54.     If Solidifi identifies issues in an appraiser's performance or work quality, Solidifi will sometimes demote the appraiser to "Watch Status." When an appraiser is on Watch Status, the appraiser must successfully complete three assignments with additional oversight before becoming eligible to return to Active Status. While in Watch Status, an appraiser receives coaching sessions from Solidifi.

55.     The Solidifi Standards provide guidance for the sales-comparison

approach. In particular, they state that the following must be clearly explained and

detailed in any appraisal: gross adjustments in excess of +/- 25%, net adjustments in

excess of +/- 15%, and line adjustments in excess of +/- 10%[12]; utilization of comps

located more than one mile from the subject property; utilization of sales that closed

more than six months prior to the effective date of the report; and utilization of comps

with a gross living area variance of +/- 20%.

56.     These standards also require the appraiser to use, as a comp, at least one

relevant listing from the subject property's immediate market.

57.     After receiving an appraisal, Solidifi reviews specific sections of the report

for valuation, looking for both overvaluation and undervaluation. Appraisals are not

forwarded to the lender until they satisfy Solidifi's review process.

58.     The policies described in Paragraphs 46 through 57 were in effect at the

time of the Subject Appraisal. The agreement between Solidifi and Maverick was

consistent with these policies.

---

[12] A net adjustment is the final percentage difference between the original sales price
and the adjusted sales price calculated after adding and subtracting each line-item
adjustment. Gross adjustments are the percentage of total adjustments made, both
positive and negative, as a percentage of the original sales price. Higher figures in
either or both categories can indicate that the selected comp is not actually that
comparable to the property being appraised.

**F.      The appraiser's visit to the Subject Property.**

59.     On January 20, 2021, Mr. Mykhailyna visited the Subject Property as part
of the process of conducting the appraisal. He was accompanied by another appraiser
whom Mr. Mykhailyna was considering hiring. Mr. Mykhailyna and the prospective
employee are both White.

60.     When Mr. Mykhailyna arrived at the Subject Property, he initially knocked
on the door of the unit where Ms. Cheroutes's tenant lived, 749 Ash Street. He spoke to
the tenant, who was a White male, and inspected his unit.

61.     After exiting the tenant's unit, Mr. Mykhailyna entered Ms. Cheroutes's
backyard without giving notice of his arrival or introducing himself. To get to her
backyard, he had to walk past the front door of the unit where Ms. Cheroutes lived, 751
Ash Street.

62.     On the day of the appraisal, the Subject Property had a Black Lives Matter
sign visible in its front yard. On their way to Ms. Cheroutes's backyard, Mr. Mykhailyna
and the prospective employee passed by the Black Lives Matter sign, and the
prospective employee made a comment about it to Mr. Mykhailyna.

63.     When Ms. Cheroutes became aware that two men had entered her
backyard, she went outside to introduce herself. Mr. Mykhailyna appeared surprised
when she said that she was the owner and did not respond to Ms. Cheroutes's attempts
to engage with him. He did not introduce or explain the role of the prospective
employee.

19

64.     Mr. Mykhailyna and the prospective employee then entered the unit. The prospective employee spoke with Ms. Cheroutes's daughter, who was a college student at the time, while Mr. Mykhailyna conducted a brief inspection. Mr. Mykhailyna saw Ms. Cheroutes and her daughter in person and thus knew that they were Black.

65.     During the home inspection, Ms. Cheroutes attempted to inform Mr. Mykhailyna of recent improvements she had made to the property since the last appraisal, including replacing the gutters; replacing both back doors; washing and staining the fence; painting; and updating the kitchen, bath, and lighting. In response to Ms. Cheroutes's statements, Mr. Mykhailyna's facial expressions indicated to Ms. Cheroutes that he was not interested in the information provided, and he did not say anything or take notes. His appraisal report did not include the information she provided.

66.     The inspection was brief, and Mr. Mykhailyna did not ask Ms. Cheroutes or her daughter any questions about the property.

67.     Based on Mr. Mykhailyna's actions during the home inspection, Ms. Cheroutes was concerned that his appraisal would not fairly represent the value of her home, and she expressed those concerns to her daughter.

68.     Mr. Mykhailyna and Maverick completed the Subject Appraisal on January 21, 2021. The appraised value was $640,000.

**G.     The Subject Appraisal was significantly lower than both earlier and later appraisals of the Subject Property.**

69.     Between 2013 and 2022, Ms. Cheroutes obtained six appraisals and one residential evaluation of the Subject Property, primarily in conjunction with refinancing

her mortgage to make renovations to the Subject Property or to take advantage of

decreasing interest rates (with Rocket as the lender in three of these instances). As

shown in the table below, these valuations reflected the consistent rise in prices in the

Denver real-estate market, and in her popular neighborhood, with one exception: the

Subject Appraisal.

| Date of Appraisal/Residential Evaluation | Appraised Value |
|---|---|
| 7/30/2013 | $552,000 |
| 2/5/2015 | $575,000 |
| 10/7/2016 | $600,000 |
| 12/19/2018 | $755,000 |
| 5/22/2020 | $860,000 |
| *1/20/2021 (Subject Appraisal)* | *$640,000* |
| 3/13/2022 | $885,000[13] |

70.    This steady rise in value (except for the Subject Appraisal) also reflects

the care Ms. Cheroutes took of the Subject Property. Upon purchasing the duplex in

2011, she invested roughly $200,000 in renovations. Since then, she had spent

thousands of dollars per year, and expended significant time and effort, on maintenance

and repairs.

71.    Between the May 2020 appraisal and the Subject Appraisal in January

2021, Ms. Cheroutes made various improvements to the Subject Property, as described

above. She replaced the back doors and the gutters, installed new granite countertops

---

[13] The March 2022 evaluation was labeled a "residential evaluation" rather than an
appraisal and did not include an inspection of the interior of the property.

in the kitchen, and painted and updated the bathrooms, including replacing the vanity and lighting.

72.    The Subject Appraisal was more than 25 percent lower than the $860,000 appraisal in May 2020, only eight months before the Subject Appraisal.

73.    No change in the Subject Property or the Denver real-estate market justified the decrease in value present in the Subject Appraisal. First, the home's condition did not deteriorate between 2020 and 2021, nor was any major defect discovered. On the contrary, Ms. Cheroutes had invested in improvements between the 2020 appraisal and the Subject Appraisal. Second, the market for residential properties in Denver did not deteriorate due to market conditions or economic factors. Rather, media articles in the months and even weeks prior to the Subject Appraisal touted Denver's record-setting housing market, including a CNBC article from October 5, 2020, titled "Denver suddenly has one of the most competitive housing markets in America," and another article published in 5280 Magazine *just a week before the Subject Appraisal was conducted* with the headline, "Denver's 2020 Real Estate Market Saw an Unprecedented Number of Records Broken."[14]

---

[14] CBS News Colorado, *Denver Ranked #4 Hottest Real Estate Market During COVID Pandemic* (Nov. 18, 2020), available at https://perma.cc/W7L3-CV7F;
Diana Olick, *Denver suddenly has one of the most competitive housing markets in America*, CNBC (Oct. 5, 2020), available at https://perma.cc/DF9N-XHYA;
Cassidy Ritter, *Denver's 2020 Real Estate Market Saw an Unprecedented Number of Records Broken*, 5280 Magazine (Jan. 13, 2021), available at https://perma.cc/7RXJ-M7QL.

74.     The Subject Appraisal was also significantly lower than the December 2018 appraisal, which was $755,000. In contrast, between December 2018 and December 2020, the median sale price of townhouses and condominium properties in Denver County had increased by almost 9 percent. Thus, in comparison to the 2018 appraisal, the Subject Appraisal valued Ms. Cheroutes's home 22 percent lower from what would have been expected if Ms. Cheroutes's property had been consistent with median sales prices in Denver. There had been no significant change to the Subject Property or its surrounding neighborhood that would account for this significantly lower valuation.

**H.    Mr. Mykhailyna's choices and errors in appraising the property showed that his view of the Subject Property was affected by race.**

75.     Mr. Mykhailyna's decision to value the Subject Property at $640,000 was based on a series of intentional choices and suspect errors that Mr. Mykhailyna made as part of the appraisal process. Those choices and errors signaled that his view of the Subject Property was affected by the race of its owner.

**1.    Mr. Mykhailyna defined the Subject Property's neighborhood based on Ms. Cheroutes's race, grouping the Subject Property with faraway neighborhoods with much greater Black populations.**

76.     Mr. Mykhailyna approached the valuation of the Subject Property by associating it with properties in neighborhoods with higher percentages of Black residents. The uniform appraisal form that he used contained a fill-in-the-blank statement intended to give the reader a sense of the current market conditions in the

property's "subject neighborhood." Mr. Mykhailyna completed the statement with the following figures:

**Small Residential Income Property Appraisal Report**    File # OR6467251

There are   9   comparable properties currently offered for sale in the subject neighborhood ranging in price from $ 400,000   to $  750,000

77.     This price range did not accurately reflect home prices in Ms. Cheroutes's popular Hale neighborhood or similar, nearby neighborhoods. Rather, this range was based largely on properties from distant neighborhoods with far higher percentages of Black residents than Hale.

78.     When HUD asked Mr. Mykhailyna to provide the properties he used to define the subject neighborhood, he provided the properties marked on the map below with black squares, with the Subject Property marked with a red square. The shading on the map shows the percentage of Black residents.



### Properties Used to Define Subject Neighborhood

Legend
- Subject Property
- Property Used to Define Subject Neighborhood

Percent Black Population 2020 Census Block Group
- 0% - 10%
- 11% - 20%
- 21% - 30%
- 31% - 40%
- 41% - 100%

Prepared by:
U.S. Department of Justice
Civil Rights Division
Washington, D.C. 20530

79.     Only one of the properties Mr. Mykhailyna referred to was in the Subject Property's neighborhood of Hale, and six were in neighborhoods with four to five times as many Black residents as Ms. Cheroutes's actual neighborhood. Those six properties were also located many miles from the Subject Property.

80.     Homes in Hale and adjacent neighborhoods generally had higher prices than the distant homes in neighborhoods with higher Black populations that Mr. Mykhailyna used to define the Subject Property's neighborhood. By using those distant properties to set the range for Ms. Cheroutes's "subject neighborhood," Mr. Mykhailyna caused the $640,000 appraisal to appear well within the range of comparable properties.

**2. Mr. Mykhailyna chose sales comps based on race, selecting less valuable properties from distant neighborhoods with larger Black populations instead of similar properties from nearby neighborhoods.**

81.     Solidifi's agreement with Maverick instructed it to choose sales comps within one mile of the subject property (i.e., a circular one-mile radius with the focal point at the subject property). When Mr. Mykhailyna searched for sales within one mile, there were six duplex results, shown in the following table. These results had higher average sales prices than the properties he eventually chose as sales comps.

| Duplex Sales Within One Mile of Subject Property | |
|---|---|
| **Address** | **Price** |
| 1001-1003 Adams Street | $1,221,500 |
| 1300 Madison Street | $700,000 |
| 1451 Garfield Street | $665,000 |
| 1465 North Monroe Street | $696,250 |
| 1117 Garfield Street | $660,000 |
| 1476 Dahlia Street | $698,000 (used as sales comp) |

82.    Without any legitimate, non-discriminatory justification, Mr. Mykhailyna
decided against selecting his sales comps from that pool of six. Instead, he expanded
the search radius to 2.5 miles, generating a list of twenty-seven duplexes that had sold
within the prior year. The following map shows these twenty-seven results,
distinguishing between the four properties he chose as comps and the twenty-three
properties he did not choose:



Mr. Mykhailyna's Search Results
Residential Income Duplexes Sold During Prior Year
Located Within 2.5 Miles of Subject Property

83.    Only five of the twenty-seven duplexes were to the east of the Subject
Property and Colorado Boulevard (the north-south street marked in yellow, running just
to the west of the Subject Property). Nevertheless, Mr. Mykhailyna chose four of these
five properties to use as comps and did not use any of the twenty-two duplexes to the
west of the Subject Property, even though several of them are closer to the Subject
Property than the comps he did use.

84.    Mr. Mykhailyna's later explanation of his east-only approach was suspect.
He stated that he did so because the major street to the west, Colorado Boulevard, was
a "hard" neighborhood border, thus suggesting that comps could not be sourced from
that area. But by restricting the search in this manner, almost all of the comps he
ultimately chose also crossed neighborhood borders and crossed major streets. Most of
the comps that Mr. Mykhailyna chose were not even in adjoining neighborhoods, as
opposed to the closer and adjoining—but mostly White—Congress Park neighborhood
to the west, from where he chose not to draw comps.

85.    Mr. Mykhailyna's refusal to look west of Colorado Boulevard for comps
was also inconsistent with his approach in an appraisal he had completed just prior for
the White owners of a fourplex property located 0.7 miles to the east, in the same
neighborhood as the Subject Property. In that appraisal, Mr. Mykhailyna chose four
comps to the west of the property, including two on the other side of Colorado
Boulevard, in Congress Park. He made these choices even though the property being
appraised was farther from Congress Park than the Subject Property. Furthermore,

when appraising that property owned by a White family, he defined the property's
neighborhood to include much of Congress Park.

86.    Each of the four sales comps Mr. Mykhailyna selected for the Subject
Appraisal are in census block groups and in neighborhoods with higher concentrations
of Black residents than that of the Subject Property.

87.    Multiple properties to the west were more similar to the Subject Property in
terms of location, size, and/or condition than the properties Mr. Mykhailyna chose as
comps. Those properties to the west were in areas with lower concentrations of Black
residents than the areas from which Mr. Mykhailyna chose comps.

88.    The comps chosen by Mr. Mykhailyna deviated from the Subject Property
in other obvious ways. Two of them were within a few feet of East Colfax Avenue, a
street with a well-known reputation for activity considered detrimental to housing value,
often drawing law enforcement and thus loud sirens and bright lights late at night. This
reputation and activity had a significant detrimental effect on the value of homes located
near this part of Colfax Avenue. This reputation was common knowledge to anyone
familiar with the area and certainly to an appraiser in Denver.

89.    The selected comps were not even half a block from this part of East
Colfax Avenue. One of the East Colfax-adjacent comps was across the street from an
abandoned building and adjacent to a car shop specializing in oil changes. Another
comp was across the street from a discount used car dealership. These characteristics
would be expected to depress the values of those comps when compared to the quiet,

tree-lined residential street where the Subject Property was located. But Mr. Mykhailyna chose to make only small upwards adjustments ($10,000 and $14,000, or two percent of the sales prices) to account for these substantial differences in location and attractiveness.

90.     In contrast, when Mr. Mykhailyna conducted an appraisal for the White owners of a fourplex property less than a mile from the Subject Property, Mr. Mykhailyna made upwards adjustments of $74,000 and $87,000 (10 percent of the sales price for these comps) for comps he chose that were in locations with lower property values. Mr. Mykhailyna completed this other appraisal just one month before the Subject Appraisal.

91.     A third comp he chose was located in a distant neighborhood from Hale, Washington-Virginia Vale. That property had an assessed land value by the Denver Assessor's Office in 2021 of $24.60 per square foot, far lower than the Subject Property's land, which was valued at $64.96 per square foot. According to Denver's Assessor's Office in that same year, Ms. Cheroutes's land was worth $242,400 *more* than the "comp" in Washington-Virginia Vale. But in the Subject Appraisal, Mr. Mykhailyna inexplicably adjusted that comp *downwards* by $16,000 because it had a slightly larger lot size than the Subject Property.

92.     As a fifth comp, Mr. Mykhailyna chose a listing that had not yet sold. This listing was even farther northeast than any of the four sales comps and in a neighborhood with an even higher percentage of Black residents.

31

93.    Mr. Mykhailyna's selection of comps was also inconsistent with prior appraisals of the same property carried out by different appraisers subject to the same professional standards and rules. Despite Mr. Mykhailyna's stated rationale that neighborhoods to the west were not comparable, prior appraisals of the Subject Property relied heavily on sales comps west of the Subject Property, including west of Colorado Boulevard. For example, in the May 2020 appraisal, all sales comps were west of the Subject Property. In the 2018 appraisal, all but one of the sales comps were west of the Subject Property, with three sales comps located in Congress Park.

94.    In sum, Mr. Mykhailyna's selection of sales comps further showed that race affected his view of the Subject Property's value. Through his selection of sales comps, Mr. Mykhailyna associated the Subject Property with properties in more distant neighborhoods rather than ones geographically close to Hale, with properties with lesser marketability because of their proximity to East Colfax Avenue, and with areas with higher concentrations of Black residents.

**3.    Mr. Mykhailyna also lowered the Subject Property's appraised value by making numerous unsupported adjustments and errors that deviated from his own past practices.**

95.    In generating the Subject Appraisal, Mr. Mykhailyna made numerous adjustments that deviated from appraisal standards and other appraisals of the Subject Property and that unjustifiably reduced the Subject Property's value.

96.    The map displayed after Paragraph 82 ("Mr. Mykhailyna's Search Results") displays the pre-adjustment sales prices of the sales comps selected by Mr.

Mykhailyna. Mr. Mykhailyna adjusted the two highest-value comps downwards because they had larger lot sizes than the Subject Property. But he used an inexplicably large multiplier of $40 per square foot to apply the adjustment, which resulted in a 13 percent downwards adjustment from the sale price of two of the comps. In dollar terms, this adjustment amounted to a decrease in value of $96,800 and $93,600 for these two comps, which significantly depressed their value as comparable properties.

97.     These large lot size adjustments were not only unjustified but also inconsistent with Mr. Mykhailyna's prior practices. In the sixteen appraisals of two- to four-unit properties that Mr. Mykhailyna had completed in Denver between 2020 and 2022, he had never used anywhere near such a large multiplier. In fact, in twelve of those appraisals, his lot size adjustments applied a multiplier no greater than $5 per square foot.

98.     These large lot-size adjustments were also inconsistent with prior appraisals by others of the Subject Property. The 2020 appraisal applied no lot-size adjustments. The 2018 appraisal applied a $1 per square foot adjustment. And the 2015 appraisal also applied no lot-size adjustments, despite two of the comparable properties having 50 percent larger lots than the Subject Property.

99.     Mr. Mykhailyna's lot-size adjustments also exceeded Solidifi's standards, which require an explanation for specific adjustments of more than 10 percent. But Mr. Mykhailyna did not supply any reasoned justification for these adjustments. All he wrote in the addendum of the Subject Appraisal was that he had conducted a "matched pair

33

analysis of comparable lot sizes in the subject's market area"; he did not elaborate further.

100.    If Mr. Mykhailyna had instead used a multiplier of $5 per square foot, the decrease in dollar value based on lot size for the comps discussed in Paragraph 95 would have been $12,100 and $11,700—a less than 2 percent downwards adjustment from the comps' sales prices.

101.    Mr. Mykhailyna also did not accurately report a major component of property valuations: the number of bedrooms. In his appraisal report, he excluded the third bedroom in the basement of each unit of the Subject Property. In contrast, for three of the sales comps he selected, he included basement bedrooms. This difference should have resulted in upwards adjustments had Ms. Cheroutes's basement bedrooms been counted.

102.    Mr. Mykhailyna's unjustified exclusion of the basement bedrooms significantly lowered the value he assigned to the Subject Property. In the appraisal report, he wrote that the value per bedroom of the comps was $160,000. By that metric, if he had included the two basement bedrooms, the value of the Subject Property would have been $320,000 higher.

103.    Another comp that Mr. Mykhailyna chose (one of those located near East Colfax Avenue) required such large upwards adjustments that they exceeded Solidifi's standards in multiple ways, as explained below. This level of adjustment suggests that

the property was not actually comparable because the Subject Property was superior in so many respects.

104.    In the Subject Appraisal, Mr. Mykhailyna also incorrectly listed the Subject Property's neighborhood elementary school as Palmer Elementary School, which is northeast of the Subject Property. The Subject Property's actual neighborhood elementary school is Steck Elementary School, which is south of the Subject Property and much closer than Palmer. Palmer has a much higher concentration of Black students (19 percent) than Steck (only 4 percent). On the other hand, when appraising a nearby property owned by White homeowners, he correctly identified the closest neighborhood school.

105.    Mr. Mykhailyna made a number of other errors, such as using gross living area as opposed to gross building area; under-counting the Subject Property's gross living area; failing to mention improvements that had been made to the property; incorrectly stating that the property lacked a fence, attic, and energy-efficient appliances; and incorrectly rating the condition of one of the comps. These errors demonstrate a lack of attention to detail that mirrored Mr. Mykhailyna's cursory inspection of the Subject Property and his dismissive attitude towards Ms. Cheroutes.

106.    Mr. Mykhailyna's improper adjustments and errors were inconsistent with the USPAP, which requires appraisers to "be aware of, understand, and correctly employ those recognized methods and techniques that are necessary to produce a

credible appraisal" and "not commit a substantial error of omission or commission that
significantly affects an appraisal." USPAP Standards Rule 1-1 (2020-2021).

**I.      Solidifi reviewed the Subject Appraisal.**

107.     On January 21, 2021, Mr. Mykhailyna and Maverick submitted the Subject
Appraisal to Solidifi.

108.     In multiple ways, the Subject Appraisal did not comply with Solidifi's
standards and requirements for appraisers. For example, whenever an appraiser's net
adjustments to a comp exceeded 15 percent, or gross adjustments exceeded 25
percent, Solidifi required a clear and detailed explanation. The adjustments Mr.
Mykhailyna made for one of the comps exceeded both of these standards, with net and
gross adjustments totaling 28.4 percent. However, he did not provide a clear and
detailed explanation for these adjustments.

109.     For income producing properties such as the Subject Property, Solidifi
also required a clear and detailed explanation for the use of any comps with a gross
building area that deviated more than 20 percent from the property being appraised.
Although three of the comps had gross building areas that deviated more than 20
percent, Mr. Mykhailyna provided no explanation.

110.     More generally, Solidifi requires appraisals to comply with the USPAP. As
explained above, the Subject Appraisal did not.

111.     After Mr. Mykhailyna submitted the Subject Appraisal to Solidifi, Solidifi
conducted a review. Although the Subject Appraisal did not comply with Solidifi's

standards and requirements for its appraisers, Solidifi did not request any changes or

take any corrective action based on its review.

112.    Later on January 21, 2021, Solidifi submitted the Subject Appraisal to

Rocket.

**J.    After Ms. Cheroutes reported to Rocket that the Subject Appraisal was discriminatory, Rocket adhered to the Subject Appraisal and canceled her refinancing application.**

113.    After Solidifi transmitted the Subject Appraisal to Rocket, Ms. Cheroutes

was able to view the appraisal. She was surprised that the valuation was so low.

114.    Ms. Cheroutes repeatedly attempted to contact Rocket with her concerns

about the low value of the appraisal, and her belief that Mr. Mykhailyna had

undervalued the Subject Property because of her race. Prior to the appraisal, her

primary loan officer at Rocket was Brandon Swales, and he had been very enthusiastic

about Ms. Cheroutes's application, telling Ms. Cheroutes that a multi-unit home in

Denver was a good buy in the current market.

115.    After the appraisal, Ms. Cheroutes contacted Mr. Swales and explained

that she believed the Subject Appraisal was discriminatory and mentioned that she

wanted another appraisal. Ms. Cheroutes explained that during the site inspection she

had a Black Lives Matter sign in the yard and that she regretted being in the house

because Mr. Mykhailyna was able to see that it was owned by a Black person. Mr.

Swales agreed that a 25 percent decrease in value from a prior appraisal completed

less than a year ago did not make sense, and he explained that Rocket would review

the appraisal. Mr. Swales referred Ms. Cheroutes to Matthew Watson, a Solution

Consultant for Rocket.

116.    Ms. Cheroutes also spoke with Rocket representative Nikki Cogburn via

an online chat, stating that there were issues of discrimination in the loan process. Ms.

Cogburn also referred her to Mr. Watson.

117.    Ms. Cheroutes spoke to Mr. Watson on January 25, 2021. She told him

about errors in the appraisal and informed him that she believed the low appraisal was

due to racial discrimination. She explained that Mr. Mykhailyna had been hostile and

unfriendly to her and did not listen to the facts about the house that Ms. Cheroutes tried

to relay to him.

118.    Mr. Watson did not take any action to investigate her report of

discrimination or dispute it. Rather, he told Ms. Cheroutes that because she had raised

the issue of discrimination, he could not talk to her or help her.

119.    Mr. Watson also told Ms. Cheroutes that if she did not agree to proceed

with a loan based on the $640,000 appraisal, he would cancel the loan.

120.    Proceeding with the loan based on the discriminatory appraisal would

have been adverse to Ms. Cheroutes. The terms in Rocket's previous written loan

estimate, before the Subject Appraisal, had been based on the estimated value of

$860,000. Any loan based on the $640,000 appraisal would necessarily have included

less favorable terms for Ms. Cheroutes. Indeed, following the appraisal, Rocket

generated a revised written loan estimate with less favorable terms.

38

121.    Ms. Cheroutes told Mr. Watson that if Rocket canceled her refinance application because she was reporting discrimination, Rocket would be involving itself in the discrimination by ignoring her complaint. She stated that she wanted another appraisal conducted of the Subject Property. Mr. Watson referred Ms. Cheroutes to another department at Rocket, Client Relations.

122.    Rocket canceled the refinance application before Ms. Cheroutes could even speak to Client Relations. Indeed, on January 25, 2021, the same day he spoke to Ms. Cheroutes, Mr. Watson wrote an internal note in Rocket's system that he "[n]otified client this loan has been cancelled."

123.    On January 26, 2021, Rocket generated a letter from Mr. Swales to Ms. Cheroutes stating, "we are unable to offer you financing at this time" due to the "Low appraised value" of the property. Emails between Rocket employees in the subsequent days stated that the appraisal "caused the loan to no [sic] make sense" and that the loan was "killed" due to "a low appraised value."

124.    Ms. Cheroutes spoke with Abril CanoBaca from Rocket's Client Relations department on January 28, 2021. Ms. Cheroutes informed Ms. CanoBaca that she believed that the Subject Appraisal was discriminatory. Ms. CanoBaca said that there was nothing she could do regarding the discrimination beyond making yet another referral, this time to Rocket's legal team.

125.    Ms. CanoBaca also stated that Ms. Cheroutes could provide her own sales comps for the appraisal, with any suggested sales comps to be evaluated by Mr.

Mykhailyna. But Ms. CanoBaca also told Ms. Cheroutes that Rocket's underwriting team only cared if the gross adjustments in an appraisal exceeded 25 percent and that the gross adjustments in the Subject Appraisal fell below that threshold. This latter representation was inaccurate because the gross adjustments for one of the comps in the Subject Appraisal did exceed that threshold.

126.   Ms. CanoBaca also represented to Ms. Cheroutes that Rocket sends discrimination complaints to the legal team and that Rocket did investigate complaints of discrimination.

127.   Ms. Cheroutes's final conversation with Rocket was on February 1, 2021, with Randall Griebel, who was also from the Client Relations department. Mr. Griebel did not address Ms. Cheroutes's concerns about discrimination but repeated that the only way to challenge the appraisal was for Ms. Cheroutes to submit her own sales comps, thus placing the burden on her to remedy her own allegation of discrimination. He also stated that Ms. Cheroutes's discrimination complaint had been sent to Rocket's legal team but informed her that the legal team might not contact her regarding the complaint. Mr. Griebel said that he did not have any knowledge about the actions of the legal team.

128.   Rocket's legal team did not contact Ms. Cheroutes, Solidifi, or Mr. Mykhailyna regarding the discrimination allegation.

129.   Rocket was aware of Ms. Cheroutes's race. Ms. Cheroutes mentioned her race in conversations with Mr. Swales and Ms. CanoBaca, and she made it clear to Mr.

Swales, Mr. Watson, and Ms. CanoBaca that she believed she had been subjected to discrimination on the basis of her race.

130.    Rocket knew, based on the appraisal report and the information provided by Ms. Cheroutes, of facts showing that the Subject Appraisal had undervalued the Subject Property based on her race. Despite knowing these facts, Rocket relied on the discriminatory appraisal in its decision to deny Ms. Cheroutes's loan application.

131.    To avoid relying on the discriminatory appraisal, Rocket could have ordered an appraisal of the Subject Property from a different appraiser. *See* 12 C.F.R. § 1026.42(c)(3)(iv). Rocket could also have attempted to remedy the discrimination through a variety of other means, including by requesting that Mr. Mykhailyna consider more appropriate comps and fix other errors in the Subject Appraisal. *See* 15 U.S.C. § 1639e(c); 12 C.F.R. §§ 1026.42(c)(3)(i), (iii), (vi). In fact, Rocket did request that Mr. Mykhailyna correct an error in the Subject Appraisal unrelated to Ms. Cheroutes's complaint, and Mr. Mykhailyna corrected that error.

**K.    Harm Ms. Cheroutes suffered from Defendants' discrimination.**

132.    Ms. Cheroutes experienced financial and emotional harm due to Defendants' discrimination.

133.    Because Rocket canceled her refinance application, she was unable to obtain a refinance mortgage loan that would have had a lower interest rate, a shorter term, and lower monthly payments.

134.    Ms. Cheroutes did not try to refinance her mortgage through a different company because she was afraid that she would continue to be discriminated against during the appraisal process. Instead, she applied for a variable-rate home equity line of credit ("HELOC"), which was less favorable financially than the refinance with Rocket, but which only required a drive-by appraisal.

135.    Ms. Cheroutes experienced emotional distress and humiliation due to Defendants' apparent belief that her house was worth less because it was owned by a Black person. She also feared that her son, who was in the process of seeking to buy a home, would likewise experience racial discrimination. She also suffered emotional distress and humiliation as a result of the decision by Rocket to retaliate against her by responding to her complaint of discrimination by cancelling the loan.

### HUD ADMINISTRATIVE PROCESS

136.    On April 27, 2021, Ms. Cheroutes timely filed a complaint with the Colorado Civil Rights Division ("CCRD") alleging that Rocket, Maverick, and Mr. Mykhailyna engaged in one or more discriminatory housing practices.

137.    On June 8, 2021, the complaint was transferred to HUD with the consent of CCRD.

138.    The complaint was amended on June 16, 2021, and again on October 12, 2021, to add Solidifi as a respondent.

139.    Pursuant to 42 U.S.C. § 3610(a) and (b), the Secretary of HUD conducted and completed an investigation of the HUD complaint and prepared a final investigative

42

report. Based on the information gathered during the investigation, the Secretary determined, pursuant to 42 U.S.C. § 3610(g)(1), that reasonable cause existed to believe that Defendants had violated the Fair Housing Act.

140.    On July 15, 2024, the Secretary issued a Charge of Discrimination pursuant to 42 U.S.C. § 3610(g)(2)(A).

141.    On July 22, 2024, Ms. Cheroutes elected to have the claims asserted in HUD's Charge of Discrimination resolved in a civil action pursuant to 42 U.S.C. § 3612(a).

142.    On July 23, 2024, a HUD Administrative Law Judge issued a Notice of Election to Proceed in United States Federal District Court and terminated the administrative proceedings. Following the Notice of Election, the Secretary of HUD authorized the Attorney General to commence a civil action pursuant to 42 U.S.C. § 3612(o).

143.    The United States and Defendants executed tolling agreements extending the expiration of any statute of limitations in this action from August 21, 2024, to October 21, 2024.

**CAUSE OF ACTION: VIOLATION OF THE FAIR HOUSING ACT**

144.    The United States re-alleges and incorporates by reference the allegations set forth above.

145.    By the conduct described above, Defendants engaged in one or more "[d]iscriminatory housing practice[s]" as defined by 42 U.S.C. § 3602(f).

146.    Specifically, Defendants discriminated in making available a residential real estate-related transaction, or in the terms or conditions of such a transaction, because of race or color, in violation of 42 U.S.C. § 3605.

147.    The discriminatory housing practices of Defendant Mykhailyna were taken while he was acting as agent of Defendant Maverick, were within the scope of that agency, and were taken with Maverick's actual or apparent authority.

148.    The discriminatory housing practices of Defendants Mykhailyna and Maverick were taken while they were acting as agents of Solidifi, were within the scope of that agency, and were taken with Solidifi's actual or apparent authority.

149.    The appraisal of Ms. Cheroutes's property by Defendants Mykhailyna, Maverick, and Solidifi was completed for and at the request of Defendant Rocket. Defendant Rocket was reliably informed that the appraisal undervalued Ms. Cheroutes's property because of race or color. Defendant Rocket had the authority to correct the discriminatory appraisal, or cause it to be corrected, but failed to do so.

150.    Further, Defendant Rocket coerced, intimidated, threatened, or interfered with Ms. Cheroutes in the exercise or enjoyment of, or on account of her having exercised or enjoyed, rights granted or protected by 42 U.S.C. § 3605, in violation of 42 U.S.C. § 3617.

151.    Ms. Cheroutes is an "[a]ggrieved person," as defined in 42 U.S.C. § 3602(i), and has suffered damages as a result of Defendants' discriminatory conduct.

152.    Defendants' discriminatory conduct was intentional, willful, and taken in reckless disregard of the rights of Ms. Cheroutes.

**PRAYER FOR RELIEF**

WHEREFORE, the United States prays for relief as follows:

a.  Declare that Defendants Rocket Mortgage, LLC; Solidifi U.S. Inc.; Maksym Mykhailyna; and Maverick Appraisal Group Inc. violated the Fair Housing Act, 42 U.S.C. §§ 3601–3619;

b.  Enjoin Defendants, including their agents, employees, and successors, and all other persons in active concert or participation with Defendants, from:

   i.   Engaging in discrimination on the basis of race or color in making available real estate-related transactions, or in the terms or conditions of such transactions;

   ii.  Failing or refusing to take such affirmative steps as may be necessary to restore, as nearly as practicable, Ms. Cheroutes to the position she would have been in but for the discriminatory conduct; and

   iii. Failing or refusing to take such affirmative steps as may be necessary to prevent the recurrence of any discriminatory conduct in the future;

c.  Enjoin Defendant Rocket, including its agents, employees, and successors, and all other persons in active concert or participation with Defendant Rocket, from coercing, intimidating, threatening, or interfering with persons in the

45

exercise or enjoyment of, or on account of their having exercised or enjoyed, their rights granted or protected by 42 U.S.C. § 3605;

d. Award monetary damages to Ms. Cheroutes pursuant to 42 U.S.C. §§ 3612(o)(3) and 3613(c)(1); and

e. Award any other legal and equitable relief that the Court finds to be just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury of all issues so triable pursuant to Fed. R. Civ. P. 38.

Dated October 21, 2024.

| | |
|---|---|
| | MERRICK B. GARLAND<br>Attorney General |
| MATTHEW T. KIRSCH<br>Acting United States Attorney | KRISTEN CLARKE<br>Assistant Attorney General<br>Civil Rights Division |
| s/ Zeyen J. Wu<br>**Alicia Alvero Koski**<br>**Zeyen J. Wu**<br>Assistant United States Attorneys<br>United States Attorney's Office<br>1801 California Street, Suite 1600<br>Denver, CO 80202<br>Telephone: (303) 454-0100<br>Email: zeyen.wu@usdoj.gov | s/ Nathan Shulock<br>CARRIE PAGNUCCO<br>Chief<br>TIMOTHY J. MORAN<br>Deputy Chief<br>**Nathan Shulock**<br>Trial Attorney<br>Housing and Civil Enforcement Section<br>Civil Rights Division<br>U.S. Department of Justice<br>150 M Street, NE<br>Washington, DC 20530<br>Telephone: (202) 598-3254<br>Email: nathan.shulock@usdoj.gov |
| | Attorneys for Plaintiff<br>United States of America |